**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**ROBERT ALLEN, EARL GILLIAM** and
**PAULINE A. GILLIAM,**
        Plaintiffs,

        v.

**FIELDSTONE MORTGAGE COMPANY,
KEYSTONE MORTGAGE, INC.,
HOUSEHOLD FINANCE CORPORATION,
ATLAS CUSTOM BUILDERS, INC.,
21st CENTURY APPRAISAL,**
and **CITY OF CHICAGO,**
        Defendants.

)
)
)
)
)  Case No.
)
)
)
)
)
)
)
)



01C 3829

JUDGE ZAGEL
MAGISTRATE JUDGE LEVIN

**DOCKETED**
MAY 2 5 2001

**INDIVIDUAL AND CLASS ACTION COMPLAINT**

## I. Nature of Complaint

Plaintiffs Robert Allen, Earl Gilliam and Pauline Gilliam bring this action on their

own behalf and as a class action to correct egregiously harmful home-loan refinancing

schemes whereby elderly, minority, disabled homeowners are targeted as likely customers

for illegal, discriminatory, and high-cost mortgage loans when defendant finance company

has reason to know these borrowers either cannot repay or can repay the loan only

through extreme personal and financial privation.  These customers are induced into

entering into home loans at inflated rates and are wrongfully charged for settlement

services and for "junk fees," that is, padded closing costs which bear no reasonable

relationship to the service for which the fee is charged.  A part of this scheme to

overcharge unwitting loan customers are payments of duplicative fees and illegal

kickbacks to mortgage brokers, undisclosed to the loan customers, which wrongfully are

added to the principle amount financed, artificially increasing monthly payments and

leading to foreclosure. The home-repair loan in question took over 79% of the three plaintiffs' combined monthly income and was guarantied to fail. The loan was to pay for extensive home repairs which were never done although almost one hundred thousand dollars were paid for the repairs. Unknown to plaintiffs, the loan was foreclosed and, after a trial also unknown to plaintiffs, their house was demolished because of serious code violations. Then the City of Chicago charged plaintiffs for the costs of demolishing their home.

This action arises under the Real Estate Settlement Procedure Act ("RESPA"), 12 USC §2607 *et seq.;* the Truth in Lending Act ("TILA"), 15 USC §1601; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 USC §1862 *et seq.,* and accompanying federal regulations and state common law.

Plaintiff Robert Allen seeks to represent a class composed of all persons who, like all the named plaintiffs, have borrowed money through defendants Keystone Mortgage Company and Fieldstone Mortgage Company, in transactions which include the payment of "yield spread premiums" (also called "yield/rebate," "overage," "servicing-release premium," and other synonyms) to mortgage brokers when the RESPA statement in the individual settlement procedure itemizes other, duplicative services paid for by the borrower (Count I); those borrowers who paid yield spread premiums when no additional services were rendered by the broker for which they had not already paid and, therefore, were illegal kickbacks (Count II); and borrowers who were charged inflated, duplicative or "junk fees" as itemized on the RESPA statement (Count III). The criteria of this alleged consumer fraud scheme for each member of the proposed class is described in greater detail below.

On personal knowledge as to their own affairs and on information and belief, based on the investigation and analysis of their counsel, plaintiffs state for their complaint the following:

## II. Jurisdiction and Venue

1. This court has subject matter jurisdiction pursuant to RESPA, 12 USC §2607 *et seq.;* and accompanying federal regulations, 24 CFR §35.00.14(c), 28 USC §1331; under TILA, 15 USC §1601, *et seq.,* 12 CFR §226.18, Regulation "Z," @226.18(d), and Regulation X, 24 CFR §3500.14; the Home Ownership and Equity Protection Act ("HOEPA"), 15 USC §1638 *et seq.;* RICO, 18 USC §1862 *et seq.;* and, pursuant to the court's supplemental jurisdiction, 28 USC §1357, the Illinois Consumer Fraud & Deceptive Practices Act ("ICFA"), 815 ILCS §Sec. 505, and Illinois common law.

2. Venue is proper as the plaintiffs reside in, the defendants do business and have major places of business in, and the acts complained of occurred in, and the property in question is located within the district and division of this court.

## III. The Parties

### a. Plaintiffs

3. Plaintiff Robert Allen, 54 years old, an African-American citizen of the United States, is disabled due to blindness and is in poor health due to other ailments. He is financially dependent on Social Security disability payments of $921 per month. He is unschooled, unsophisticated, and inexperienced in ways of finance, deeds, home improvement loans, mortgages, and unlawful schemes and practices connected with them.

4. From 1982 until 1997, until events occurred as described below, he lived with his wife and five children in a three-flat home owned by his mother and foster father,

Pauline and Earl Gilliam, at 1136 North Hamlin Avenue, Chicago, Illinois 60651, legally described as follows:

> LOT 44 IN BLOCK 1 IN THOMAS J. DIVEN'S SUBDIVISION OF THE WEST 1/2 OF THE SOUTH WEST 1/4 OF THE SOUTH WEST 1/4 AND THE EAST 1/2 OF THE NORTH WEST 1/4 OF THE SOUTH WEST 1/4 OF SECTION 2, TOWNSHIP 39 NORTH RANGE 13, EAST OF THE THIRD PRICIPAL MERIDIAN IN COOK COUNTY, ILLINOIS. (the "property")

5. Plaintiff Earl Gilliam, the foster father of plaintiff Robert Allen and the husband of plaintiff Pauline Gilliam, is 70 years old, disabled, unable to read documents, and for approximately twenty years, has undergone kidney dialysis treatments three times per week. Totally dependent on Social Security payments of $159.80 per month and veteran's benefits of $564 per month, he is unschooled, unsophisticated, and inexperienced in ways of finance, deeds, home improvement loans, mortgages, and unlawful schemes and practices connected with them. He is incapable of entering into a contract.

6. Plaintiff Pauline Gilliam, 76 years old, is and, at all times relevant to this complaint, was suffering from Alzheimer's Disease and the effects of a serious stroke. She has no functional memory and cannot read or write. During the times at issues, she was receiving $494 per month from Social Security. She is unschooled, unsophisticated, and inexperienced in ways of finance, deeds, home improvement loans, mortgages, and unlawful schemes and practices connected with them. She is incapable of entering into a contract.

b. Defendants

7. Defendant Fieldstone Mortgage Company ("Fieldstone"), a Maryland corporation with a principal place of business in Downers Grove, Illinois, was formed in

1995 as a national, non-conforming residential mortgage lender and has over 350 employees in over 30 regional offices. Fieldstone has originated over $1 billion in mortgage loans since 1996, is licensed to originate first- and second-lien mortgage loans in over 40 states, and regularly extends credit to persons, including home-equity, home-purchase and refinancing lending, in what the lending industry calls the "B/C" or "subprime" credit market where borrowers, often because of impaired credit or limited incomes, and sometimes because of race and age, pay prices higher than for "A" residential mortgage loans. Approximately 50% of all mortgage loans, including Fieldstone's and those of Household Finance Corporation, are originated by mortgage brokers, many of whom are paid yield spread premiums. Fieldstone used the United States mail and telephone in the course of such activities and was engaged in commerce.

8. Defendant Household Finance Corporation ("Household Finance"), a foreign corporation, is a subsidiary of Household International, Inc. which, with more than 40 million customers, is the second-largest consumer finance company in the United States. Household Finance operates under the names "HFC" and "Beneficial" and has more than 1,400 branch offices, including within the district and division of this court.

9. Defendant Keystone Mortgage is an Illinois corporation with a principal place of business in Addison, Illinois. Its chief executive officer is Michael D. Russotto.

10. Defendant Atlas Custom Builders, Inc. is an Illinois corporation with a principal place of business in Chicago, Illinois. Formerly known as Eagle Builders, Inc., its president is Martin Ross.

11.  Defendant 21st Century Appraisal is an Illinois corporation with a major place of business in Chicago, Illinois.  Its director is Charles A. Jackson, a real estate appraiser licensed by the State of Illinois.

12.  Defendant City of Chicago is a municipal corporation of the State of Illinois.

## IV.  Statement of Facts

13.  From 1982 until 1997, Robert Allen lived with his wife and children in the property, a three-flat owned by Robert Allen's mother, Pauline Allen, and his step-father, Earl Gilliam, who also lived in the property.  Tenants lived on the third floor and in the basement of the property, Robert Allen and his family on the second floor, and his parents on the first.

14.  In the spring of 1997, a fire broke out on the third floor of the property.  The Chicago Fire Department extinguished the fire which caused considerable damage, along with resulting water damage, to all apartments, making the property uninhabitable.

15.  Earl Gilliam's homeowner insurer, Allstate Insurance Company ("Allstate"), arranged for Robert Allen, his wife, children and parents, to move into a motel and later into an apartment while the property was to be secured and then repaired.

16.  However, before the property could be adequately secured, vandals entered the property, caused additional severe damage, and stole all appliances, fixtures and things of value.

17.  Allstate paid Earl Gilliam for the theft of personal goods and appliances pursuant to his homeowner insurance policy.  Allstate also paid off a first mortgage on the property and gave Earl Gillian approximately $29,000 of the remaining insurance coverage, $23,000 of which Earl Gillian paid to a contractor to board-up and secure the

fire-damaged, vandalized property.

18.   After the fire, Robert Allen's wife read a newspaper advertisement about a company, Atlas Custom Builders ("Atlas"), which claimed to be able to repair damaged property.   After Robert Allen telephoned Atlas, a contractor, Martin Ross, came, inspected the property, and informed Robert Allen that Earl Gilliam's remaining proceeds from Allstate were not sufficient to complete the repairs and that an additional loan would be needed.  Then Martin Ross asked for and received from Earl Gilliam a check for $9,000 as a "good faith payment" for the proposed repairs.

19.   On or about July 14, 1998, Charles Jackson, a licensed appraiser for defendant 21st Century Appraisal, submitted to Keystone Mortgage, Inc. an appraisal of the property based, he said, on his personal inspection of the property.  He estimated that the property had had a market value of $225,000.   Charles Jackson further stated: "The Subject Property is a typically built multi-family unit dwelling in average condition.   Physical depreciation is due to normal wear and tear of the elements.   There is no functional obsolescence..."

20.   In September of 1998, Martin Ross phoned Robert Allen and said that Earl Gilliam was too old to secure a mortgage loan for the remaining home repairs.  Ross said he could arrange for Robert Allen to be loaned $35,000 to repair the roof but more money, as much as $200,000, would be needed to repair the entire property.  Martin Ross told Robert Allen that he wanted to take him and Earl and Pauline Gilliam to downtown Chicago to sign for the loan of additional money for the repair work

21.  On September 29, 1998, Martin Ross' son, "Martin Ross, Jr.", at that time employed as a loan officer and mortgage broker for Keystone Mortgage, picked up the

plaintiffs in his car and took them to the closing of the loan at O'Connor Title Guaranty, Inc., One North LaSalle St., Suite 3030, Chicago, Illinois. At the closing, Martin Ross, Jr. told plaintiffs where to sign the loan papers. Robert Allen, Pauline and Earl Gilliam could not and did not read any of the papers before signing them. Martin Ross, Jr. told them words to the effect: "I'm for you all. I don't want to beat you out of anything. I'll help you get the money you need to fix your house up. You can get someone to read the papers to you later." Martin Ross, Jr. assured everyone that repair work would begin soon on the property.

22. On the same date of the closing as described above, Fieldstone prepared a loan application, attached as Exhibit A to this complaint.

23. At the closing, Fieldstone charged plaintiffs fees, as more fully shown on Exhibit B to this complaint, listed as follows (with enumeration as on the RESPA form):

| | | |
|---|---|---|
| 804. | Credit Report to Bureau Express | 60.00 |
| 809. | Mortgage Broker fee to Keystone Mortgage | 5,400.00 |
| 810. | Courier fee to Fieldstone Mortgage Corporation | 21.00 |
| 811. | Tax Service fee to Transamerica | 61.00 |
| 812. | Underwriting fee to Fieldstone Mortgage Corporation | 599.00 |
| 813. | Processing fee to Keystone Mortgage | 300.00 |
| 814. | Flood Certification fee to Transamerica | 19.00 |
| 815. | Courier fee to Keystone Mortgage | 100.00 |
| 816. | Broker fee to Keystone Mortgage Corporation POCL..2700.00 | 2,700.00 |
| 817. | Hazard insurance premium for 1 yrs to Farmers Insurance Group | 500.00 |
| 1201. | Recording fees: Mortgage $35.50 Release $102.00 | 137.50 |
| 1306. | payoff Mech.Lien to Atlas Custom Builders | 98,504.60 |

24. Also on September 29, 1998, Fieldstone assigned the loan and transferred the deed to the property to Household Finance, document number 98882048.

25. In 1999, Robert Allen received a telephone call from Household Finance which advised Robert Allen that the repair work had been completed on the property and

that the parties could return to the building to reside and that plaintiffs were late in their mortgage payments.

26. Robert Allen then went with his wife to inspect the property only to find that their home had been demolished.

27. On July 6, 1999, in case number 99 CH 9762, and then not known by any plaintiff, Household Finance foreclosed against Earl Gilliam for $134,951.34.

28. Robert Allen later was informed for the first time and hereby states that on April 20, 2000, the City of Chicago filed a complaint, case number 00 M1 402230, pleading that the property be demolished because of serious code violations. Service was completed on the holder of the deed, Household Finance, on May 2, 2000. The City of Chicago neglected to perfect service of the complaint on or give notice of the trial to Robert Allen, Earl or Pauline Gilliam. At trial on August 8, 2000, neither Household Finance nor any other defendant to that proceeding (including the plaintiffs in this instant case) appeared. After hearing testimony and reviewing evidence that "all vitals" were stripped, that the floors were warped, and that that the property was beyond reasonable repair, the court ordered that the property be demolished.

29. On or about April 1, 2001, Robert Allen received a letter from the City of Chicago stating that a lien in the amount of $10,393 had been filed with the Recorder of Deeds of Cook County, Illinois, representing the costs and expenses for the City of Chicago to demolish the property, and demanding from Robert Allen payment of the lien. Ex. H.

## V. Individual Counts

### Count 1-
### Yield Spread Premium is a Prohibited Kickback or Duplicative Fee

29. Plaintiffs reallege paragraphs 1-29 of the complaint.

30. The settlement charges and fees, as listed in paragraph 23, above, and on Exhibit B attached to this complaint, amount to more than 8% of the loan amount and, therefore, Defendant Fieldstone is subject to HOEPA.

31. No defendant, before, during or after the closing for the loan as described above, ever informed or disclosed to any plaintiff the existence or purpose of the "Mortgage Broker fee to Keystone Mortgage," for $5,400.00, or the "Broker fee to Keystone Mortgage Corporation" (identified as "yield/rebate" for 2% of amount financed on the Broker Demand Sheet, attached as Exhibit C, and hereafter in this complaint referred to as the "yield spread premium") listed as paid outside of closing for $2,700 but made part of the amount financed (identified on lines 809 and 816 of Exhibit B, attached, and paragraph 23, above) and neither requested nor received from any plaintiff permission to be charged for any service, good or facility which Fieldstone had offered to Keystone, a mortgage broker.

32. Defendants' purpose in offering the yield spread premium and all payments to the mortgage broker, as described above, and as agreed to among themselves, was to reduce or eliminate price competition in the broker-sourced mortgage loan market. In fact, the identified broker fees were payments made by Fieldstone to Keystone, a mortgage broker, in exchange for Keystone's bringing to them borrowers who would be required to pay a higher-than-market interest rate for their loan and who

would pay inflated fees for services and for duplicative services which would be added to the amount financed.

33.  Plaintiffs received no compensable good, service or facility for the yield spread premium or the other broker fees, collected by Fieldstone and paid to Keystone, which were not included in the goods, services and facilities plaintiffs paid to Fieldstone, as listed in paragraph 23, above; and, therefore, the yield spread premium and the other mortgage broker fees were duplicative payments not reasonably related to any goods, services or facilities provided.  These fees charged to plaintiffs and to members of the class were not for goods or facilities actually furnished or for services which were actually performed for the compensation paid.

a.  Mortgage Broker Fees or Yield Spread Premiums Are Duplicative Fees.

34.  The mortgage broker fee to Keystone, $5,400, was duplicative of and exactly twice the yield spread premium to Keystone, $2,700.00 (lines 809 and 816, paragraph 23 above).  In addition, these two broker fees were duplicative of the fees for other alleged services Fieldstone charged plaintiffs which include, but are not necessarily limited to:

812.  Underwriting fee to Fieldstone Mortgage Corporation....................599.00
813.  Processing fee  to Keystone Mortgage......................................300.00
814.  Courier fee to Keystone Mortgage...........................................100.00
(Paragraph 23 above and Ex. B)

35.  The yield spread premium or brokerage fee Fieldstone paid to Keystone was not for $5,400, as identified on the Truth in Lending statement (attached as Exhibit D). Rather, it was for $8,100 (lines 809 and 816, paragraph 23 above and Ex. B).

36.  Fieldstone's purpose in offering this payment of a yield spread premium to Keystone, as agreed to among themselves on a date and at a place presently unknown to

plaintiffs, was to reduce or eliminate price competition in the broker-sourced mortgage loan market. The "yield spread premium" was a payment made by Fieldstone to Keystone for Keystone's bringing to them borrowers who would be induced into paying a higher-than-market interest rate for their loan, inflated fees, and duplicative services.

37. Plaintiffs received no additional good, service or facility for the yield spread premium, collected by Fieldstone and paid to Keystone, which was not listed in paragraph 23, above. The yield spread premium was a duplicative payment of, at least, $2,700 and was not reasonably related to any goods, services or facilities provided.

b. Above-Par Interest Was a Duplicative Fee to Pay for Yield Spread Premium.

38. The yield spread premium and the broker fees charged by Fieldstone and paid to Keystone increased the interest rate for plaintiffs' loan. Fieldstone set the interest charged plaintiffs, 10.95% adjustable to 16.95 (Ex. D), higher than "par" (par is the base interest rate at which a lender makes a loan on a particular date) in order to offset its payment of the yield spread premium to Keystone. The higher-than-par interest rate was a fee duplicative of those closing fees charged to plaintiffs as listed in paragraph 23, above.

39. Fieldstone never informed plaintiffs that the interest rate it would charge was or would be increased to offset the yield spread premium it paid to Keystone. Plaintiffs never agreed to pay the above-par rate in exchange for any good, service or facility.

40. Plaintiffs and each class member received no compensable good, service or facility for the yield spread premium, collected by Fieldstone, which was not included in the other goods, services and facilities for which plaintiffs and class members were charged, including the above-par interest rate. Therefore, the yield spread premium was a duplicative payment and in excess of the fair market value of, and not reasonably related

to, any goods, services or facilities provided.

41. As a result of Fieldstone's payment of the yield spread premium, which was then offset by the above-par interest rate and duplicative closing fees listed above, Fieldstone wrongfully obtained money from plaintiffs for the yield spread premium and has been and continues to be unjustly enriched. Fieldstone caused damage to plaintiffs and the class in an amount equal to the yield spread premium listed on the RESPA statement of each member of the class.

### c. Fieldstone Padded Its Fees to Offset Yield Spread Premium.

42. The fees charged to plaintiffs and each member of the class were not for goods or facilities actually furnished or for services which were actually performed for the compensation paid. These fees were duplicative of the yield spread premium each class member paid. Each fee Fieldstone charged plaintiffs, as listed in paragraph 23 above, including but not limited to the $599 underwriting fee to Fieldstone, the $300 processing fee to Keystone, and the $100 courier fee to Keystone, is duplicative of the fee paid for any service covered by the yield spread premium; therefore, each is unearned, inflated, and bears no reasonable relationship to services proved, and is in violation of Section 8 of RESPA, 12 USC §2607(a)(b), and of 24 CFR §3500.14 (a)(b).

43. Fieldstone offset its payment of the yield spread premium to Keystone by inflating the cost of each closing service charged to plaintiffs, as listed in paragraph 23 above. Other members of the class have been similarly damaged.

44. The Mortgage Broker Fee for $2,375 (line 811, paragraph 23 above), was not listed as "Paid Outside Closing," and wrongfully was added to the amount financed by plaintiffs, in violation of 24 CFR 3500.7(a)(2) and 24 CFR part 3500, Appendix A. Other

members of the class have been similarly harmed.

45.  Each of the fees as listed in paragraph 23, above, is duplicative of one another and unearned, and is duplicative of the "yield spread premium," as identified on line 811 of Exhibit A, attached, and paragraph 11, above, and therefore unearned, and is in violation of Section 8 of RESPA, 12 USC §2607, and of 24 CFR §3500.14 (a)(b).

## Count 2
### Yield Spread Premium Is a Prohibited Referral Fee

1-45.  Plaintiffs repeat and reallege paragraphs 1-45.

46.  The yield spread premium paid by Fieldstone, identified in paragraph 23 above as the mortgage broker fee for $5,400 and the broker fee to Keystone Mortgage for $2,700, was a payment for no goods, services or facilities provided by Keystone or was in excess of the fair marker value of any goods, services or facilities provided.  The yield spread premium could not and did not reflect the fair market value of any service any defendant might have provided to plaintiffs.

47.  The yield spread premium as identified above as "yield/rebate" was paid by Fieldstone to Keystone, not in exchange for quality or quantity of services but as a percentage—exactly 2%—of the amount financed, and unnecessarily and unreasonably increased the costs of settlement services.  The yield spread premium was a kickback or payment to a mortgage broker for the referral of plaintiffs, in violation of Section 8 of RESPA, 12 USC §2601(b)(2), 2607(a)(b), and of 24 CFR §3500.14.  Moreover, each member of the class who paid a yield spread premium as indicated on each borrower's RESPA statement has been similarly harmed.

## Count 3
## Defendants Charged Inflated, Fraudulent Fees

1-47. Plaintiffs repeat and reallege paragraphs 1-47.

48. Line 801 of the RESPA form is to be used to record the fee charged by the lender for processing or originating the loan. 24 CFR Ch. XX (4-1-99) Edition, Pt. 3500, App. A. Fieldstone left this line blank.

49. Robert Allen and Earl Gilliam on August 8, 1998, signed a "Borrower-Broker Agreement," which they could not and did not read or understand, prepared and signed by Keystone, which states that the origination fee for their loan would be $5,400. The agreement also states that the borrower would pay Keystone a brokerage fee of 3% of the amount financed—that is, 3% of $180,000 or $5,400. Exhibit F. The amount of plaintiffs' loan was $135,000.

50. The fees Fieldstone charged plaintiffs, as on the RESPA statement identified in paragraphs 23 above, were not for goods or facilities actually furnished or for services which were actually performed for the compensation paid. Each fee Fieldstone charged plaintiffs is unearned, inflated, and bears no reasonable relationship to services proved, and is in violation of Section 8 of RESPA, 12 USC §2607(a)(b), and of 24 CFR §3500.14 (a)(b). Each member of the class has been similarly harmed.

## Count 4
## TILA

1-50. Plaintiffs repeat and reallege paragraphs 1-50.

51. The settlement charges and fees, as listed in paragraph 23 above and on Exhibit A, amount to more than 8% of the loan amount and, therefore, Fieldstone is subject to HOEPA, all provisions of 15 USC §§1368, 1369 apply, and Fieldstone is in violation of

same.

52.   Both Fieldstone and Keystone failed to disclose to plaintiffs prior to the closing of the loan as described above in paragraph 23, the cost of the credit and the nature of the terms of credit offered to them, including description of the components of finance charges and the material terms of their loan, the rate or effective rate of interest, the period, the schedule of amounts to be repaid, pre-payment provisions, or any other term of each loan or credit, including their right to cancel, and each failed to give them a copy of a TILA statement at least three days prior to the closing of each loan, all in violation of TILA, 15 USC §1639.

**Count 5**
**Fraud**

1-52.  Plaintiffs repeat and reallege paragraphs 1-52.

53.  As more specifically set forth in Counts 1 through 4 above, at specific times and places as indicated in individual counts, defendants agreed among themselves and fraudulently concealed from plaintiffs the following material facts:

a.  they were charging plaintiffs yield spread premiums;

b.  plaintiffs' costs for the settlement of their loan with Fieldstone were duplicative and inflated to offset the payment of the yield spread premium and to enrich defendants;

c.  the interest rate for plaintiffs' mortgage loan with Fieldstone would be and was increased by defendants to pay for the yield spread premium and to enrich themselves,

d.   Fieldstone entered into an agreement with Atlas pursuant to which

Fieldstone would pay Atlas at the closing as described above, $98,504.60 from the amount financed by the plaintiffs for repair work on the property which Atlas had not completed and would not complete.

e. 21st Century Appraisal entered into an agreement with Keystone, at a time and place to be determined, to submit a false, artificially-inflated appraisal of the property, $225,000, so that Keystone could qualify plaintiffs for a home-equity loan for $135,000 and, thereby in return, 21st Century Appraisal would receive a fee for services it did not perform and would get additional business from Keystone;

f. Keystone, so that plaintiffs would qualify for a loan, fraudulently prepared and had Earl Gilliam sign monthly rental agreements. The first, dated August 1, 1998, while the property was uninhabitable, states that one John Morgan, a fictitious tenant, agreed to pay rent for an apartment of the property for $800 per month. The second, also dated August 1, 1998, states that another fictitious tenant, one Lori Shepperd, also would pay rent of $800 per month. Exhibit G.

g. defendants would charge plaintiffs a brokerage fee based on an inflated rate, as described in paragraph 23 and 49, above.

h. and other members of the class were similarly, fraudulently deceived.

54. Defendants further intentionally, knowingly and recklessly misrepresented that they were offering plaintiffs a loan at competitive prices when, in fact, the settlement charges and interest were set and agreed to among the defendants at an artificially high rate and were not reasonably related to any goods, services or facilities provided. Other members of the class were similarly misrepresented.

## Count 6
## Civil Conspiracy

1-56.  Plaintiffs repeat and reallege paragraphs 1-56.

57.  Upon information and belief, Keystone, Fieldstone and Household Finance, at specific times and places as indicated in the individual counts of this complaint, entered into a conspiracy with one another and their agents to defraud plaintiffs by concealing the existence and cost of the yield spread premium paid by Fieldstone to Keystone, by increasing the above-par interest rate and by padding settlement costs, as listed above, to pay for the yield spread premium, to pay Atlas $98,504.60 for repair work which Atlas had not completed and would not complete, all done to enrich themselves, and to provide themselves with unearned fees.  These misrepresentations, omissions and conspiratorial acts, which are more fully set forth above and below, were to the detriment of plaintiffs because they prevented them from questioning the high rates and charges for their home-repair loan and forestalled legal action or otherwise.

58. Other members of the class, in a manner similar to what defendants conspired to do to plaintiffs as identified in paragraphs 52 and 53, above, have been damaged by the defendants' civil conspiracy.

## Count 7
## RICO

1-58.  Plaintiffs repeat and reallege paragraphs 1-58, including descriptions of the predicate acts directed by defendants against plaintiffs and members of the class, forming the basis of racketeering activity, as listed in Counts 1 through 6, above.

59.  This cause of action is brought against all defendants pursuant to provisions of 18 USC. §1962(c).

60. All defendants are "persons" within the meaning of 18 USC §§1961(3) and 1962(c).

61. Each defendant is an "enterprise" within the meaning of 18 USC §§1961(4) and 1962(c). Alternatively, all defendants, and others known and unknown to plaintiffs, are associated in fact for the purpose of depriving plaintiffs and members of the class of their constitutional, statutory, and common law rights. This association in fact constitutes and "enterprise" within the meaning of 18 USC §§1961(4) and 1962(c)

62. Each plaintiff and each member of the class is a "person" within the meaning of 18 USC §1961(3) and for purposes of civil remedies provision, 18 USC §1964(c).

63. At all times relevant to this complaint, each defendant was and is engaged in, and its activities affect, interstate and foreign commerce.

64. At all times relevant to this complaint, defendants engaged in a conspiracy to infringe upon and tortuously interfere with plaintiffs' constitutional, statutory, and common law rights, described in detail above in counts 1-6, and attempted to collect an unlawful debt.

65. Defendants Keystone and Fieldstone knowingly and willfully associated with the association-in-fact enterprises, as described above.

66. All defendants committed or aided and abetted the commission of at least two acts of fraud, described in counts 1 through 6 above, and intended to commit or aid and abet the commission of additional acts of fraud, civil conspiracy, and the collection of an unlawful debt. More specifically but not exclusively, each defendant participated in unlawful conduct as follows:

a. After the fire to their property as described above, Martin Ross, an agent of Atlas Home Rebuilding, Inc., asked for and received from Earl Gilliam a check for $9,000 as a "good faith payment" for the proposed repairs when he had no intention of making the promised repairs;

b. On or about July 14, 1998, Charles Jackson of 21st Century Appraisal, submitted to Keystone Mortgage, Inc. a fraudulent appraisal of the property;

c. On September 29, 1998, Martin Ross, Jr., an agent of Keystone, took the plaintiffs to the closing of the loan at O'Connor Title Guaranty, One North LaSalle St., Suite 3030, Chicago, Illinois, directed them to sign loan papers which they could not and did not read, purposely mislead them into trusting him, and falsely told them that repair work would soon proceed and be completed on their property. Ross told plaintiffs that Keystone could obtain a mortgage loan for them with favorable terms. Keystone knew that these inducements mere false, misleading and to plaintiffs' detriment. Keystone made these misrepresentation with malice, intent and knowledge. Plaintiffs reasonably relied on Keystone's false inducements. Keystone concealed from plaintiffs the material information that the interest for their home loan would be set at an above-par rate to offset the yield spread premium Keystone would receive for bringing them as clients to Fieldstone who would pay higher rates and fees. On September 29, 1998, Fieldstone charge plaintiffs inflated, padded, fraudulent settlement fees.

d. On September 29, 1998, Fieldstone assigned the loan with its inflated, padded, fraudulent settlement fees and transferred the deed to the property to Household Finance;

e. In 1999, Robert Allen received a false and misleading telephone call from Household Finance advising Robert Allen that the repair work had been completed on the property and that the parties could return to the building to reside;

f. At no time prior to or after July of 1999, did Household Finance ever disclose to any plaintiff that it had filed a foreclosure action for the mortgage loan secured by their property;

g. The City of Chicago refused or neglected to serve plaintiffs with the complaint or with notice that a trial would be held to determine whether the property should be demolished;

h. Household Finance neglected or refused to defend the complaint filed by the City of Chicago seeking to demolish the property for serious code violations, and failed or refused to attend the trial on April 20, 2000, thus leading to default and demolition of the property;

i. The loan Keystone and Fieldstone arranged for plaintiffs, and which defendants presented to plaintiffs on November 6, 1998, at the closing at Advantage Title Company, 3841 W. 95th St., Evergreen Park, Illinois 60805, contained an undisclosed yield spread premium added to the principle and paid to Keystone; an interest rate which was artificially-set at an above-par rate; and settlement fees which were duplicative, padded, and fraudulent. The loan, requiring monthly payments of over 75% of plaintiffs' income from Social Security and VA benefits, was unconscionably expensive and designed to fail. Keystone and Fieldstone injured plaintiffs by inducing them to enter into this loan.

j. Fieldstone knew that the loan contained terms which were false, misleading and to plaintiffs' detriment. Fieldstone presented the loan to plaintiffs with

malice, intent and knowledge.  Plaintiffs reasonably relied on Fieldstone's and Keystone's inducements to sign the loan which contained fraudulent terms.  Fieldstone and Keystone concealed from plaintiffs the material information that the interest for their home loan would be set at an above-par rate to offset the yield spread premium Fieldstone would pay Keystone for bringing plaintiffs as clients to Fieldstone.

k.  On November 6, 1998, as described above, Fieldstone conspired with Keystone to charge plaintiffs settlement fees which were padded, duplicative, bore no relationship to services actually provided, and were fraudulent.

l.  Keystone and Fieldstone, neither before, during nor after the closing for the loan described above, ever informed or disclosed to plaintiffs the existence or purpose of the "yield spread premium" and neither requested nor received from them permission to be charged for any service, good or facility which Fieldstone had offered to Keystone, a mortgage broker.

m.    Fieldstone's and Keystone's purpose in paying the yield spread premium as described above and as agreed to among themselves, was to reduce or eliminate price competition in the broker-sourced mortgage loan market thereby enriching themselves at the expense of plaintiffs.

n.    The above-par interest rate Keystone arranged for and Fieldstone charged plaintiffs, 12.4%, was a fee duplicative of those closing fees Fieldstone charged to plaintiffs as listed in paragraph 23, above.

o.  Fieldstone, in order to enrich itself and to offset its payment of the yield spread premium to Keystone, fraudulently inflated the costs of the closing service charged to plaintiffs, and billed plaintiffs and attempted to collect from them payments for the

fraudulent loan by using the United States mail.

p. Household Finance, on the date and place as specified above, knowingly participated in the conspiracy by receiving a loan originated at Fieldstone which it knew or should have known was fraudulent, and participated in the fraud by billing and receiving payments from plaintiffs in payment of the fraudulent loan, and added its own fraudulent, padded fees to the already-inflated settlement costs.

r. The unlawful conduct described above constitutes a "pattern of racketeering activity" within the meaning of 18 USC §§1961(1) and 1961(5) in violation of 18 USC §1962(c).

s. Plaintiff and members of the class have been injured as a result of defendants' activities.

## Count 8
### Breach of Fiduciary Duty

1-66. Plaintiffs repeat and reallege paragraphs 1-66.

67. When Keystone presented itself to plaintiffs as a mortgage broker and when it undertook to find financing on their behalf, a principal and agent or fiduciary relationship was created, pursuant to which Keystone had a duty to exercise diligence in finding the best rate available for a mortgage loan to finance plaintiffs' home improvements and refinancing, and to inform plaintiffs of the loan's terms.

68. Keystone did not attempt to find financing at the best rate available for plaintiffs, but, instead, passed on plaintiffs, as it did with other customers, to Fieldstone in order to enrich itself by being paid an undisclosed yield spread premium, thus breaching its fiduciary duty to and harming plaintiffs.

69.  In addition, Keystone breached its fiduciary duty to plaintiffs in the following ways:

a.  Keystone failed to provide the best possible loan terms for plaintiffs;

b.  Keystone received a yield spread premium for services it did not perform when the cost of the yield spread premium was passed on to the plaintiffs;

c.  Keystone failed to inform plaintiffs of the terms of the loan with Fieldstone;

d.  Keystone induced plaintiffs to pay for a loan with Fieldstone which included inflated, duplicative fees and the cost of the yield spread premium, to their harm and to the benefit of their agent.

70.  Because Keystone did not perform its fiduciary duty, as specified in paragraphs 68 and 69 above, the yield spread premium it received from Fieldstone and paid for by plaintiffs was excessive.  Furthermore, all members of the class whose mortgage brokers were paid an undisclosed yield spread premium by Fieldstone similarly have been harmed.

## Count 9
## Illinois Consumer Fraud & Deceptive Practices Act

70.  Plaintiffs repeat and reallege paragraphs 1-70.

71.  The Illinois Consumer Fraud & Deceptive Practices Act ("ICFA"), 815 ILCS Sec. 505.2, provides:

> Unfair methods . . and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentations or the concealment, suppression or omission of any material fact, with intent that others rely upon [the same] . . . are hereby declared unlawful whether any person has in fact been

misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to section 5(a) of the federal Trade Commission Act.

72. Defendants engaged in deception, consumer fraud, false pretense, false promise, misrepresentation and concealment, by intentionally, knowingly and recklessly misrepresenting that they were offering plaintiffs the best available loan at competitive prices. In fact, the settlement charges and interest for the loan were set and agreed to among the defendants at an artificially high rate, were fraudulent, and were not reasonably related to any goods, services or facilities provided, and other members of the class were similarly misrepresented, as alleged above. Such action was willful, for pecuniary gain at the expense of plaintiffs and other members of the class, and in violation of 815 ILCS Sec. 505.2.

### V. Class Action Allegations

73. Pursuant to Fed. R. Civ. P. 23, Plaintiff Robert Allen brings this action on his own behalf and as representative party on behalf of the following similarly-situated classes, each member of which will be adversely affected by Fieldstone's intended conduct as described:

    a.  All borrowers from Fieldstone who, during the past four years, as indicated on their individual RESPA form, have been charged both for yield spread premiums (and synonyms) and for itemized settlement fees and who have not signed a contract with a mortgage broker specifying and agreeing to the payment of yield spread premiums;

    b.  All borrowers from Fieldstone who, as indicated on their individual RESPA

plaintiff nor his counsel has any conflicting interests and each is able to vigorously pursue this action. A class action is a superior method for the fair and sufficient adjudication of this controversy.

## VI. Jury Demand

77. Plaintiffs demand trial by jury.

WHEREFORE, plaintiffs request that this court determine this to be a proper class action, appoint Plaintiff Robert Allen as a class representative and the plaintiffs' counsel as class counsel, that the court enter judgment in their favor, and in favor of the class, and enter such judgment as to include statutory, compensatory, punitive and exemplary damages, attorney fees, litigation expenses, including fees for expert witnesses, and costs for each count in this complaint, and that the court enjoin such future wrongful acts as committed by the defendants, and that the court grant such other and further relief as is just.

By: _William F. Spielberger_
William F. Spielberger
Plaintiffs' Attorney

William F. Spielberger & Associates, PC
135 S. LaSalle Street, Suite 1424
Chicago, IL 60603
Phone: (312) 332-7851
Fax: (312) 201-4559
Federal Attorney Number: 91139

1401500317

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ___ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ___ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | [ ] V.A. [ ] FHA | [X] Conventional [ ] FmHA | [ ] Other: | Agency Case Number | Lender Case Number 1401500317 |
|---|---|---|---|---|---|

| Amount $ 135,000.00 | Interest Rate 10.950 % | No. of Months 360 | Amortization Type: | [ ] Fixed Rate [ ] GPM | [ ] Other (explain): [X] ARM (type): |
|---|---|---|---|---|---|

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP) 1136 N. HAMLIN CHICAGO Illinois 60651 | No. of Units 3 |
|---|---|

| Legal Description of Subject Property (attach description if necessary) | Year Built 1917 |
|---|---|

| Purpose of Loan | [ ] Purchase [X] Refinance | [ ] Construction [ ] Construction-Permanent | [ ] Other (explain): | Property will be: [ ] Primary Residence [ ] Secondary Residence [X] Investment |
|---|---|---|---|---|

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired 1982 | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot 225,000.00 $ | (b) Cost of Improvements $ | Total (a + b) $ |
|---|---|---|---|---|---|

Complete this line if this is a refinance loan.

| Year Acquired 1982 | Original Cost $ | Amount Existing Lien $ | Purpose of Refinance Repairs to Property | Describe Improvements [ ] made [ ] to be made Cost: $ |
|---|---|---|---|---|

| Title will be held in what Name(s) See Asset Attachment | Manner in which Title will be held HUSBAND AND WIFE | Estate will be held in: [X] Fee Simple [ ] Leasehold (show expiration date) |
|---|---|---|

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) Equity from Subject Property |
|---|

## III. BORROWER INFORMATION

|  | Borrower | Co-Borrower |
|---|---|---|
| Name (include Jr. or Sr. if applicable) | ROBERT ALLEN JR. | |
| Social Security Number | 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 | |
| Home Phone (incl. area code) | | |
| Age | | |
| Yrs. Sch. | | |

| Borrower: [X] Married [ ] Separated [ ] Unmarried (include single, divorced, widowed) | Dependents (not listed by Co-Borrower) no. ___ ages | Co-Borrower: [ ] Married [ ] Separated [ ] Unmarried (include single, divorced, widowed) | Dependents (not listed by Borrower) no. ___ ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. 2 mos. 1446 S. BLUE ISLAND 1ST FLOOR CHICAGO, IL 60608 | Present Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. ___ mos. |
|---|---|

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. ___ mos. | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. ___ mos. |
|---|---|

| Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. ___ mos. | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. ___ mos. |
|---|---|

## IV. EMPLOYMENT INFORMATION

|  | Borrower | Co-Borrower |
|---|---|---|

| Name & Address of Employer SOCIAL SECURITY | [ ] Self Employed | Yrs. on this job 2/ | Yrs. employed in this line of work/profession | Name & Address of Employer | [ ] Self Employed | Yrs. on this job / | Yrs. employed in this line of work/profession |
|---|---|---|---|---|---|---|---|

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

If employed in current position for less than two years or if currently ___ employed in more than one position, complete the following:

| Name & Address of Employer | [ ] Self Employed | Dates (from - to) | Name & Address of Employer | [ ] Self Em |
|---|---|---|---|---|

EXHIBIT

A

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 617.50 | $ | $ 617.50 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | | $ 1,280.54 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 41.67 |
| Dividends/Interest | | | | Real Estate Taxes | | |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | 1,200.00 | | 1,200.00 | Homeowner Assn. Dues | | |
| | | | | Other: | | 190.00 |
| Total | $ 1,817.50 | $ | $ 1,817.50 | Total | $ | $ 1,512.21 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|---|
| B | RENTAL INCOME/ | | $ 1,200.00 |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed [ ] Jointly [X] Not Jointly

| ASSETS | Cash or Market Value |
|---|---|
| Description | |
| Cash deposit toward purchase held by: | $ |
| List checking and savings accounts below | |
| Name and address of Bank, S&L, or Credit Union | |
| Acct. no. | $ |
| Name and address of Bank, S&L, or Credit Union | |
| Acct. no. | $ |
| Name and address of Bank, S&L, or Credit Union | |
| Acct. no. | $ |
| Name and address of Bank, S&L, or Credit Union | |
| Acct. no. | $ |
| Stocks & Bonds (Company name/number & description) | $ |
| | < > |
| | < > |
| | < > |
| Life insurance net cash value | $ < > |
| Face amount: $ | |
| Subtotal Liquid Assets | $ |
| Real estate owned (enter market value | $ |

Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property.

| LIABILITIES | Monthly Pmt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|
| Name and address of Company | $ Pmt./Mos. | $ |
| Acct. no. | / | |
| Name and address of Company | $ Pmt./Mos. | $ |
| Acct. no. | / | |
| Name and address of Company | $ Pmt./Mos. | $ |
| Acct. no. | / | |
| Name and address of Company | $ Pmt./Mos. | $ |
| Acct. no. | / | |
| Name and address of Company | $ Pmt./Mos. | $ |
| Acct. no. | / | |
| Name and address of Company | $ Pmt./Mos. | $ |
| | / | |

OMB No. 2502-0265

| A. U.S. Department of Housing and Urban Development | | B. Type of Loan | |
|---|---|---|---|
| | | 1. [ ] FHA    2. [ ] FMHA    3. [ ] Conv. Unins. | |
| | | 4. [ ] VA    5. [ ] Conv. Ins.    [X] Other. | |
| | | 6. File Number    98001031 | 7. Loan Number    1401500317 |
| **Settlement Statement** | | 8. Mortgage Ins. Case No. | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing: they are shown here for information purposes and are not included in the totals.

**D. Name of Borrower:** Earl J. and Pauline A. Gilliam, 1136 North Hamlin Avenue, Chicago, IL 60651
Robert Allen, Jr., 1136 North Hamlin Avenue, Chicago, IL 60651

**E. Name of Seller:** Earl J. and Pauline A. Gilliam, 1136 North Hamlin Avenue, Chicago, IL 60651    TIN:
Robert Allen, Jr., 1136 North Hamlin Avenue, Chicago, IL 60651    TIN:

**F. Name of Lender:** Fieldstone Mortgage Corporation, 1430 Branding Lane-Suite 120, Downers Grove, IL 61515

**G. Property Location:** 1136 North Hamlin Avenue Chicago, IL 60651

**H. Settlement Agent:** O'Connor Title Guaranty, Inc.    TIN:

**Place of Settlement:** One North LaSalle Street, Suite 3030, Chicago, IL 60602

**I. Settlement Date:** 9/29/98    Proration Date:    None

| J. Summary of Borrower's Transaction | | | K. Summary of Seller's Transaction | | |
|---|---|---|---|---|---|
| **100.** | **Gross amount due from borrower:** | | **400.** | **Gross amount due to seller:** | |
| 101. | Contract sales price | | 401. | Contract sales price | |
| 102. | Personal property | | 402. | Personal property | |
| 103. | Settlement charges to borrower (line 1400) | 135,000.00 | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| Adjustments for items paid by seller in advance | | | Adjustments for items paid for seller in advance | | |
| 106. | City/town taxes | | 406. | City/town taxes | |
| 107. | County taxes | | 407. | County taxes | |
| 108. | Assessments | | 408. | Assessments | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| **120.** | **Gross amount due from borrower:** | 135,000.00 | **420.** | **Gross amount due to seller:** | 0.00 |
| 200. Amounts paid by, or in behalf of the borrower: | | | 500. Reduction in amount due to seller: | | |
| 201. | Deposit or earnest money | | 501. | Excess deposit (see instructions) | |
| 202. | Principal amount of new loan(s) | 135,000.00 | 502. | Settlement charges to seller (line 1400) | 0.00 |
| 203. | Existing loan(s) taken subject to | | 503. | Existing loan(s) taken subject to | |
| 204. | | | 504. | Payoff of first mortgage loan | |
| 205. | | | 505. | Payoff of second mortgage loan | |
| 206. | | | 506. | | |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | | | 509. | | |
| Adjustments for items unpaid by seller | | | Adjustments for items unpaid by seller | | |
| 210. | City/town taxes | | 510. | City/town taxes | |
| 211. | County taxes | | 511. | County taxes | |
| 212. | Assessments | | 512. | Assessments | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |

**EXHIBIT**

B

| | L. Settlement Charges | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. | Total sales/broker commis | | | |
| | Division of commission (line 700) as follows: | | | |
| 701. | $ | | | |
| 702. | $ | | | |
| 703. | Commission paid at settlement | | | |
| 704. | | | | |
| **800.** | **Items payable in connection with loan** | | | |
| 801. | Loan origination fee | | | |
| 802. | Loan discount | | | |
| 803. | Appraisal fee | to  21st Century Appraisal | 500.00 | |
| 804. | Credit report | to  Bureau Express | 60.00 | |
| 805. | Lender's inspection fee | | | |
| 806. | Mortgage insurance application fee | | | |
| 807. | Assumption fee | | | |
| 808. | Yield Spread Premium | | | |
| 809. | Mortgage Broker fee | to  Keystone Mortgage | 5,400.00 | |
| 810. | Courier fee | to  Fieldstone Mortgage Corporation | 21.00 | |
| 811. | Tax Service fee | to  Transamerica | 61.00 | |
| 812. | Underwriting fee | to  Fieldstone Mortgage Corporation | 599.00 | |
| 813. | Processing fee | to  Keystone Mortgage | 300.00 | |
| 814. | Flood Certification fee | to  Transamerica | 19.00 | |
| 815. | Courier fee | to  Keystone Mortgage | 100.00 | |
| 816. | Broker fee | to  Keystone Mortgage Corporation    POCL 2700.00 | 2,700.00 | |
| **900.** | **Items required by lender to be paid in advance** | | | |
| 901. | Interest from    9/29/98  to  10/1/98 | | 82.13 | |
| 902. | Mortgage insurance premium for | | | |
| 903. | Hazard insurance premium for    1 yrs.    to Farmers Insurance Group | | 500.00 | |
| 904. | | | | |
| 905. | | | | |
| **1000.** | **Reserves deposited with lender** | | | |
| 1001. | Hazard insurance | | | |
| 1002. | Mortgage insurance | | | |
| 1003. | City property taxes | | | |
| 1004. | County property taxes | | | |
| 1005. | Annual assessments (maint.) | | | |
| 1006. | | | | |
| 1007. | | | | |
| 1008. | | | | |
| 1009. | | | | |
| **1100.** | **Title charges** | | | |
| 1101. | Settlement or closing fee    to  O'Connor Title Guaranty | | 175.00 | |
| 1102. | Abstract or title search | | | |
| 1103. | Title examination | | | |
| 1104. | Title insurance binder | | | |
| 1105. | Document preparation | | | |
| 1106. | Notary fees | | | |
| 1107. | Attorney's fees to | | | |
| | includes above items no.: | | | |
| 1108. | Title insurance    to  O'Connor Title Guaranty | | 410.25 | |
| | includes above items no.: | | | |
| 1109. | Lender's coverage    $159,000.00    $410.25 | | | |
| 1110. | Owner's coverage | | | |
| 1111. | Overnight processing fee    to  O'Connor Title Guaranty, Inc. | | 30.00 | |
| 1112. | EPL Endorsement    to  O'Connor Title Guaranty, Inc. | | 30.00 | |
| 1113. | ARM Endorsement    to  O'Connor Title Guaranty, Inc. | | 60.00 | |
| 1114. | | | | |
| 1115. | | | | |
| **1200.** | **Government recording and transfer charges** | | | |
| 1201. | Recording fees:    Mortgage $35.50  Release $102.00 | | 137.50 | |
| 1202. | City/county tax/stamps: | | | |
| 1203. | State tax/stamps: | | | |
| 1204. | Municipal Transfer Stamps | | | |
| 1205. | | | | |
| 1206. | | | | |
| **1300.** | **Additional settlement charges** | | | |
| 1301. | Survey | | | |
| 1302. | Pest inspection | | | |
| 1303. | Title Indemnity for sold taxes    to  O'Connor Title Guaranty, Inc. | | 4,556.52 | |
| 1304. | Hold back for 1997 second install    to  O'Connor Title Guaranty, Inc. | | 1,000.00 | |
| 1305. | payoff for Robert Allen    to  GE Custom Auto | | 19,754.00 | |
| 1306. | payoff Mech. Lien    to  Atlas Custom Builders | | 98,504.60 | |
| 1307. | | | | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | 135,000.00 | |

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipt

Sep-28-98 11:03P                                                                 P.02

## Fieldstone Correspondent/Broker Demand Sheet

```
**************PLEASE COMPLETE AND FAX BACK TO 630-769-0438**************
```

Correspondent/Broker Name: **Keystone**          Loan #: **1401500317**

Borrower Name: **Robert Allen**          Marital Status: **married**

Property Address: **1136 N. Hamlin, Chicago, IL 60651**

Loan Amount: **135,000**          Product Type: **A500**

**In Reference to the above mentioned mortgage, the following fees are to be collected:**
**ALL POINTS AND FEES MUST BE REFLECTED ON THE HUD-1**

### Correspondent/Broker Fees

| | | |
|---|---|---|
| Origination Points | 4 % = | 5400 |
| Underwriting Fees | | |
| Processing Fees | | 300  300 |
| Administration Fees | | |
| Courier Fee | | 100 |
| Miscellaneous Fees | | |
| Credit Report: | POC | (Owe) 60 |
| Appraisal: | POC | (Owe) 500 |
| SUBTOTAL | | 6360 |
| Yield/Rebate | 2 % = | 2700 |
| Total Points & Fees to Broker = | | 9060-00 |

### Fieldstone Fees

| | | |
|---|---|---|
| Origination Points | % = | |
| Underwriting Fee | | 599 |
| Flood Certification Fee | | 19 |
| Tax Service Fee | | 61 |
| Federal Express Fee | | 21 |
| Appraisal Review Fee | | |
| Miscellaneous | | |
| SUBTOTAL | | 700 |
| Discount Points | % = | |

**ALL FEES ARE SUBJECT TO CHANGE!**
1st Mtg = $ 599    2nd Mtg = $ 300
Flood Cert = $ 19    Tax Service = $ 61

### Loan Information

Transaction Type:  (1st Mtg)    2nd Mtg        Purchase      (Refinance)

Loan Type:  6 Mos Libor  (2 Yr Fixed)  15 Yr Fixed   30 Yr Fixed   30/15 Fixed

Amortization:  (30 Yr)      20 Yr        15 Yr

Interest Rate: **10.95%**          Margin: **8.00%**

Insurance Agent Name: **FARMERS**          Phone: **877 256-5500**

Dwelling Amt: **135,000**     Premium Amt: **500**     Expiration Date: **9-21-99**

ESCROW ACCOUNT: _____  Yes     X (No)

**COMPLETE VESTING** as it to appear on Mortgage/Deed of Trust:
(Note: Primary Residence - If spouse is not going on title, they will need to sign Mortgage and
several other documents to waive Marital Rights, if applicable to property's state. Need name of
spouse.)
**Ear Gilliam, Routine Gilliam husband & wife Robert Allen, Never been married**
(i.e. John Doe and Jane Doe, his wife, as joint tenants - Jane Doe, divorced and not since
remarried - John Doe, a single person, etc.)

**Closing Location/Settlement Attorney/Escrow or Title Company**

Company Name: **STEWART**          Phone: **312 629-9900**

Address: **ONE NORTH LASELLE ST # 3030 Chicago IL 60602**

Contact Person: **Tim**          Fax: **(312) 629-9901**

Scheduled Closing Date: **9-29-98**     Time: **11:30 AM**

Signature of Preparer: [signature]          Date: **9-29-98**

PLEASE NOTE: NO CLOSINGS OUTSIDE OF TITLE/SETTLEMENT AGENT OFFICE
UNLESS PRIOR APPROVED BY FIELDSTONE.

**DOCUMENTS MAY BE DELAYED IF INFORMATION IS INCOMPLETE!!**

EXHIBIT

C

## TRUTH-IN-LENDING ADDEND

| | | | |
|---|---|---|---|
| Borrower: | EARL J. GILLIAM | Date: | 9/29/98 |
| | PAULINE A. GILLIAM | Loan No.: | 1401500317 |
| | ROBERT ALLEN JR. | | |
| Property: | 1136 N. HAMLIN | | |
| | CHICAGO IL 60651 | | |
| Lender: | FIELDSTONE MORTGAGE COMPANY | | |

### ITEMIZATION OF THE AMOUNT FINANCED:

The Amount Financed is the loan amount applied for less the prepaid finance charges. The Amount Financed is the figure on which the Annual Percentage Rate (APR) is based. The following charges are those charges in connection with the loan you have applied for that are considered prepaid finance charges.

This form does not cover all items you will be required to pay in cash at settlement and only covers those items considered prepaid finance charges. For example, deposits in escrow for real estate taxes and insurance, recording fees, title fees and inspections (if applicable) are not covered on this form. You may wish to inquire as to the amounts of such other items. You may be required to pay other additional amounts at settlement.

(  ) If checked, all disclosures below are estimates.

**PREPAID FINANCE CHARGES:**          **LOAN AMOUNT:** $  135,000.00

| | | |
|---|---|---|
| Origination Fee @ _____ % | $ | _____ |
| Discount Fee @ _____ % | | _____ |
| Prepaid Interest ( 2 ) days | | |
| @ 10.850 Per Annum | | 82.13 |
| MTG BROKER FEE TO        KEYSTONE MORTGAGE | | 5,400.00 |
| COURIER FEE TO           FIELDSTONE | | 21.00 |
| TAX SERVICE FEE TO       TRANSAMERICA | | 61.00 |
| UNDERWRITING FEE TO      FIELDSTONE | | 599.00 |
| PROCESSING FEE           KEYSTONE MORTGAGE | | 300.00 |
| FLOOD CERT FEE           TRANSAMERICA | | 19.00 |
| COURIER FEE              KEYSTONE | | 100.00 |

Less Lender Paid Prepaid Finance Charge                    ( _____ )
Less Seller Paid Prepaid Finance Charges:                  ( _____ )

**TOTAL PREPAID FINANCE CHARGES:**                        ( 6,582.13 )

**AMOUNT FINANCED:**                              $  128,417.87

EXHIBIT
D

The undersigned hereby acknowledge receiving and reading a completed copy of this Disclosure prior to the consummation of the loan. Neither you nor the Lender previously has become obligated to make or accept this loan, nor is any such obligation created by

# ADJUSTABLE RATE RIDER

## (LIBOR 6 Month Index (As Published In The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this  29th  day of  September  , 1998  , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to

FIELDSTONE MORTGAGE COMPANY

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

1136 N. HAMLIN, CHICAGO, IL 60651

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of  10.950  %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of  October  , 2000  , and on that day every  6th  month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR 6 MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) -Single Family- Fannie Mae Uniform Instrument

VMP-838U (9705)          Form 3138 6/94

Page 1 of 3          Initials:

VMP MORTGAGE FORMS - (800)521-7291

EXHIBIT

E

business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **EIGHT** percentage point(s)

(     8.000    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **13.950** % or less than **10.950** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE** percentage point(s)

(     1.000    %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **16.950** %.

(E) Effective Date of Changes    **My interest rate will never be less than 10.950%.**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by

Initials:

-838U  (9705)                          Page 2 of 3                          Form 3138 6/94

Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)          _____(Seal)
EARL J. GILLIAM              -Borrower       PAULINE A. GILLIAM        -Borrower

_____(Seal)          _____(Seal)
ROBERT ALLEN JR.            -Borrower                                 -Borrower

_____(Seal)          _____(Seal)
                            -Borrower                                 -Borrower

_____(Seal)          _____(Seal)
                            -Borrower                                 -Borrower

VMP-838U (9705)                    Page 3 of 3                    Form 3138 6/94

# KEYSTONE MORTGAGE, INC

## BORROWER - BROKER AGREEMENT

_____the borrower grants to Keystone Mortgage, Inc.(Broker) for a period of 90 days from the date of this agreement the exclusive right to negotiate a mortgage loan on behalf of the borrower with the lenders with whom Keystone Mortgage, Inc. has correspondent agreements.

2) The borrower agrees to complete and provide all information requested by Keystone Mortgage, Inc. or its investors to complete the borrower's application for a mortgage loan.

3) Keystone Mortgage, Inc. agrees to process the borrower's application and use best efforts to obtain a mortgage loan for the borrowers.

4) Fees: Loan Amt __180,000__   Term __360__   Rate __12 %__

Arm __X__   Caps __116__   Margin __6.5%__   Index __Libor__

Discount _____   Origination __5400__   Premium __3600__

A) Application Fee: The borrower agrees to pay Keystone Mortgage, Inc. an Application and / or Processing Fee of $ __0__ at the time of application. This fee is a NON-REFUNDABLE FEE to reimburse Keystone Mortgage, Inc. for the costs for processing the borrower's application: costs include credit reports and appraisals.

B) Loan Fee: At the time Keystone Mortgage, Inc. obtains a mortgage loan commitment for the borrower, the borrower agrees to pay to Keystone Mortgage, Inc. a fee equal to __3__ % of the amount of the mortgage loan. This fee is payable at the time of the loan closing, and may come out of the loan proceeds. This is a fee to Keystone Mortgage, Inc. for the service of obtaining the mortgage loan. This fee is outlined in the Good Faith Estimate previously provided to you. Our estimate of cost is a Good Faith Estimate and your cost could be affected by additional conditions imposed by our end lenders, rejection and re-submission of your application to other lenders. The loan amount could change, affected by change in loan programs, appraisal of property, change in underwriting guidelines, change in debt ratio, expiration of lock in. This list is not exhaustive and other factors may affect your costs.

5) If either the borrower or Keystone Mortgage, Inc. makes a false or misleading statement to the other, then this Agreement shall become null and void. If the borrower has made a false or misleading statement, Keystone Mortgage, Inc. may keep all fees that have been paid by the borrower and recover any additional actual costs that it has incurred, including but not limited to reasonable attorney's fees for enforcing it rights under this Agreement. If Keystone Mortgage, Inc. has made a false or misleading statement, the borrower may declare this agreement null and void in which case neither party shall be obligated to perform any further. Borrower may recover any fees paid to Keystone Mortgage, Inc. for which no services have been performed and recover actual costs, including reasonable attorneys fees, incurred in enforcing the borrower's rights under this agreement.

6) This agreement incorporates, by reference the "Loan Brokerage Disclosure Statement" furnished to the borrower by Keystone Mortgage, Inc.

7) Upon request, a copy shall be made available to the borrower or the borrower's attorney for review prior to signing.

__I have read and understand all the information above.__

BORROWER: _Robert Allen_ _____

CO-BORROWER: _Earl Williams_ _____

KEYSTONE MORTGAGE, INC.: _____

DATE: __8 - 20 - 98__

EXHIBIT
F

Form A255-10
Form R255-04

# MONTHLY RENTAL AGREEMENT

**THIS AGREEMENT,** entered into this  1st  day of august , 1998 , by and between
EARL GILLIAM                                                      , hereinafter Lessor, and
JOHN MORGAN                                                      hereinafter Lessee.

**WITNESSETH:** That for and in consideration of the payment of the rents and the performance of the covenants contained on the part of Lessee, said Lessor does hereby demise and let unto Lessee, and Lessee hires from Lessor those premises described as:

located at:  1136 n hamlin ave  chicago il 60608
for a tenancy from month-to-month commencing on the  1st  day of  august  , 19 98 , and at a monthly rental of
Dollars ($  800.00  ) per month, payable monthly in advance on the  1st  day of each and every month, on the following TERMS AND CONDITIONS:

  1. **Occupants.** The said premises shall be occupied by no more than  adults and children.

  2. **Pets.** No pets shall be brought on the premises without the prior written consent of Lessor.

  3. **Ordinances and Statutes.** Lessee shall comply with all statutes, ordinances and requirements of all municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the use of the premises.

  4. **Repairs or Alterations.** Lessee shall be responsible for damages caused by his negligence and that of his family or invitees and guests. Lessee shall not paint, paper or otherwise redecorate or make alterations to the premises without the prior written consent of Lessor. All alterations, additions, or improvements made to the premises with the consent of Lessor shall become the property of Lessor and shall remain upon and be surrendered with the premises.

  5. **Upkeep of Premises.** Lessee shall keep and maintain the premises in a clean and sanitary condition at all times, and upon the termination of the tenancy shall surrender the premises to Lessor in as good condition as when received, ordinary wear and damage by the elements excepted.

  6 **Assignment and Subletting.** Lessee shall not assign this Agreement or sublet any portion of the premises without prior written consent of Lessor.

  7. **Utilities.** Lessee shall be responsible for the payment of all utilities and services, except
, which shall be paid by Lessor.

  8. **Default.** If Lessee shall fail to pay rent when due, or perform any term hereof, after not less than three (3) days written notice of such default given in the manner required by law, Lessor, at his option, may terminate all rights of Lessee hereunder, unless Lessee, within said time, shall cure such default. If Lessee abandons or vacates the property, while in default of the payment of rent, Lessor may consider any property left on the premises to be abandoned and may dispose of the same in any manner allowed by law.

  9. **Security.** The security deposit in the amount of $  800.00  , shall secure the performance of Lessee's obligations hereunder. Lessor may, but shall not be obligated to, apply all or portions of said deposit on account of Lessee's obligations hereunder. Any balance remaining upon termination shall be returned to Lessee. Lessee shall not have the right to apply the security deposit in payment of the last month's rent.

  10. **Right of Entry.** Lessor reserves the right to enter the demised premises at all reasonable hours for the purpose of inspection, and whenever necessary to make repairs and alterations to the demised premises. Lessee hereby grants permission to Lessor to show the demised premises to prospective purchasers, mortgagees, tenants, workmen, or contractors at reasonable hours of the day.

  11. **Deposit Refunds.** The balance of all deposits shall be refunded within two (2) week California) from date possession is delivered to Lessor, together with a statement showing any charges such deposits by Lessor.

  12. **Termination.** This Agreement and the tenancy hereby granted may be terminated at any

**EXHIBIT**

G

**13. Attorney's Fees.** The prevailing party in an action brought for the recovery of rent or other moneys due or to become due under this lease or by reason of a breach of any covenant herein contained or for the recovery of the possession of said premises, or to compel the performance of anything agreed to be done herein, or to recover for damages to said property, or to enjoin any act contrary to the provision hereof, shall be awarded all of the costs in connection therewith, including, but not by way of limitation, reasonable attorney's fees.

**14. Radon Gas Disclosure.** As required by law, (Landlord) (Seller) makes the following disclosure: "Radon Gas" is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in                    . Additional information regarding radon and radon testing may be obtained from your county public health unit.

**15. Lead Paint Clause.** "Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real estate is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspection in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase."

**16. Additional Terms and Conditions.**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement in duplicate the day and year first above written.

Signed in the presence of:

_____

Witness

_____        _John Morgan_

                                        Lessee

                                        X _Earl Williams_

Form A255-10
Form R255-04

# MONTHLY RENTAL AGREEMENT

**THIS AGREEMENT,** entered into this ___1st___ day of ___august___, 19 98 , by and between

     **EARL GILLIAM** , hereinafter Lessor, and

     **LORI SHEPPERD** hereinafter Lessee.

**WITNESSETH:** That for and in consideration of the payment of the rents and the performance of the covenants contained on the part of Lessee, said Lessor does hereby demise and let unto Lessee, and Lessee hires from Lessor those premises described as:

located at: 1136 north hamlin chicago il 60608
for a tenancy from month-to-month commencing on the ___1st___ day of ___august___, 19 98 , and at a monthly rental of
Dollars ($ 800.00 ) per month, payable monthly in advance on the ___1st___ day of each and every month, on the following TERMS AND CONDITIONS:

    **1. Occupants.** The said premises shall be occupied by no more than ___adults and children.___

    **2. Pets.** No pets shall be brought on the premises without the prior written consent of Lessor.

    **3. Ordinances and Statutes.** Lessee shall comply with all statutes, ordinances and requirements of all municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the use of the premises.

    **4. Repairs or Alterations.** Lessee shall be responsible for damages caused by his negligence and that of his family or invitees and guests. Lessee shall not paint, paper or otherwise redecorate or make alterations to the premises without the prior written consent of Lessor. All alterations, additions, or improvements made to the premises with the consent of Lessor shall become the property of Lessor and shall remain upon and be surrendered with the premises.

    **5. Upkeep of Premises.** Lessee shall keep and maintain the premises in a clean and sanitary condition at all times, and upon the termination of the tenancy shall surrender the premises to Lessor in as good condition as when received, ordinary wear and damage by the elements excepted.

    **6 Assignment and Subletting.** Lessee shall not assign this Agreement or sublet any portion of the premises without prior written consent of Lessor.

    **7. Utilities.** Lessee shall be responsible for the payment of all utilities and services, except
___, which shall be paid by Lessor.___

    **8. Default.** If Lessee shall fail to pay rent when due, or perform any term hereof, after not less than three (3) days written notice of such default given in the manner required by law, Lessor, at his option, may terminate all rights of Lessee hereunder, unless Lessee, within said time, shall cure such default. If Lessee abandons or vacates the property, while in default of the payment of rent, Lessor may consider any property left on the premises to be abandoned and may dispose of the same in any manner allowed by law.

    **9. Security.** The security deposit in the amount of $ 800.00 , shall secure the performance of Lessee's obligations hereunder. Lessor may, but shall not be obligated to, apply all or portions of said deposit on account of Lessee's obligations hereunder. Any balance remaining upon termination shall be returned to Lessee. Lessee shall not have the right to apply the security deposit in payment of the last month's rent.

    **10. Right of Entry.** Lessor reserves the right to enter the demised premises at all reasonable hours for the purpose of inspection, and whenever necessary to make repairs and alterations to the demised premises. Lessee hereby grants permission to Lessor to show the demised premises to prospective purchasers, mortgagees, tenants, workmen, or contractors at reasonable hours of the day.

    **11. Deposit Refunds.** The balance of all deposits shall be refunded within two (2) weeks (21 days in California) from date possession is delivered to Lessor, together with a statement showing any charges made against such deposits by Lessor.

    **12. Termination.** This Agreement and the tenancy hereby granted may be terminated at any time by either party hereto by giving to the other party not less than one full month's prior notice in writing.

**13. Attorney's Fees.** The prevailing party in an action brought for the recovery of rent or other moneys due or to become due under this lease or by reason of a breach of any covenant herein contained or for the recovery of the possession of said premises, or to compel the performance of anything agreed to be done herein, or to recover for damages to said property, or to enjoin any act contrary to the provision hereof, shall be awarded all of the costs in connection therewith, including, but not by way of limitation, reasonable attorney's fees.

**14. Radon Gas Disclosure.** As required by law, (Landlord) (Seller) makes the following disclosure: "Radon Gas" is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in _____ . Additional information regarding radon and radon testing may be obtained from your county public health unit.

**15. Lead Paint Clause.** "Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real estate is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspection in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase."

**16. Additional Terms and Conditions.**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement in duplicate the day and year first above written.

Signed in the presence of:

_____          _Lori Shepper_____
Witness                                                      Lessee

_____          X _Earl Gilliam_____
Witness



**City of Chicago**
Richard M. Daley, Mayor

Department of Law

Mara S. Georges
Corporation Counsel

Suite 700
30 North LaSalle Street
Chicago, Illinois 60602
(312) 744-8791
(312) 744-1054 (FAX)
(312) 744-8677 (TTY)

http://www.ci.chi.il.us

March 28, 2001


Robert Allen, Jr.
1446 S. Blue Island
Chicago, IL 60608


RE:   Case No. 00 M1 402230
      1136 N. Hamlin Avenue
      Chicago, Illinois


Dear Mr. Allen:

    Please be advised that pursuant to authority granted in Chapter 65, Section 5/11-31-1 of the Illinois Compiled Statutes, a lien in the amount of $10,393.00 was filed with the Recorder of Deeds of Cook County, Illinois.  This lien represents the costs and expenses incurred by the City of Chicago for demolishing the building(s) located at:  1136 N. Hamlin Avenue, Chicago, Illinois.

    We suggest that this lien be paid before foreclosure proceedings are instituted, which will result in the loss of your interest in the property plus additional costs and statutory interest being charged against the real estate.


Very truly yours,

MARK LIMANNI
Chief Assistant Corporation Counsel
Building & Housing Land Use Litigation Division

BY   *Susan Marczak*
     SUSAN MARCZAK
     Assistant Corporation Counsel


SM;ls





EXHIBIT

H

JS 44
(Rev. 12/96)

*Cat 1*

CIVIL COVER SHEET   01C 3829

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Robert Allen, Earl Gilliam and
Pauline A. Gilliam,

**DEFENDANTS**

JUDGE ZAGEL

Fieldstone Mortgage Co., Keystone Mortgage Inc., Household finance Corp., Atlas Custom Builders, Inc., 21st Century Appraisal, City of Chicago   MAGISTRATE JUDGE LEVIN
Cook

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Cook
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Cook
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
William F. Spielberger
William F. Spielberger & Assoc., PC
135 S. LaSalle St., Suite 1424
Chicago, IL 60603 (312) 332-7851

ATTORNEYS (IF KNOWN)   MAGISTRATE JUDGE LEVIN

DOCKETED
MAY 2 5 2001

**II. BASIS OF JURISDICTION**   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN**   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT**   (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☒ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act | | |
| | | ☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION**   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Home-loan re-financing scheme, 12 USC 2607.

**VII. REQUESTED IN COMPLAINT**   ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:   ☒ YES   ☐ NO

**VIII.** This case   ☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE   J-2301

SIGNATURE OF ATTORNEY OF RECORD   *William F. Spielberger*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

Robert Allen, et al.

v.

Fieldstone Mortgage et al.

**01C  3829**

Case Number:

JUDGE ZAGEL

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Robert Allen, Earl Gilliam and Pauline A. Gilliam

MAGISTRATE JUDGE LEVIN

DOCKETED
MAY 2 5 2001

| (A) | | (B) | |
|---|---|---|---|
| SIGNATURE | | SIGNATURE | |
| NAME William F. Spielberger | | NAME | |
| FIRM William C. Spielberger & Assoc., PC | | FIRM | |
| STREET ADDRESS 135 S. LaSalle St., Suite 1424 | | STREET ADDRESS | |
| CITY/STATE/ZIP chicago,IL  60603 | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER (312) 332-7851 | FAX NUMBER (312) 201-4559 | TELEPHONE NUMBER | FAX NUMBER |
| E-MAIL ADDRESS | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 91139 | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | | MEMBER OF TRIAL BAR? YES ☐ NO ☐ | |
| TRIAL ATTORNEY? YES ☒ NO ☐ | | TRIAL ATTORNEY? YES ☐ NO ☐ | |
| | | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | |
| (C) | | (D) | |
| SIGNATURE | | SIGNATURE | |
| NAME | | NAME | |
| FIRM | | FIRM | |
| STREET ADDRESS | | STREET ADDRESS | |
| CITY/STATE/ZIP | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
| E-MAIL ADDRESS | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | | MEMBER OF TRIAL BAR? YES ☐ NO ☐ | |
| TRIAL ATTORNEY? YES ☐ NO ☐ | | TRIAL ATTORNEY? YES ☐ NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | |